UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

**2 5 CRIM 5 7 9**

UNITED STATES OF AMERICA

v.

DANIEL CHU and
DAVID GOODGAME,

Defendants.

**SEALED INDICTMENT**

25 Cr.

## COUNT ONE
### (Continuing Financial Crimes Enterprise)

The Grand Jury charges:

1. From at least in or about 2018 through in or about September 2025, DANIEL CHU and DAVID GOODGAME, the defendants, conspired to and did defraud the lenders and asset-backed securities investors of Tricolor Holdings, LLC and its affiliates ("Tricolor"), a subprime auto retailer and financing company. CHU, Tricolor's founder and chief executive officer ("CEO"), GOODGAME, Tricolor's chief operating officer, and others, operated Tricolor through systematic fraud. At CHU's direction, multiple Tricolor executives repeatedly defrauded lenders using various fraudulent schemes, including "double-pledging" collateral—pledging assets to support one loan and then pledging the same assets to another lender to support another loan. Other fraudulent schemes directed by CHU involved manipulating the descriptions and classification of assets pledged as collateral for loans to make ineligible, near-worthless assets appear to meet lender requirements. Over time, this series of fraudulent schemes had a profound effect on Tricolor, which obtained hundreds of millions of dollars in cash advances; on CHU, who used a portion of the funds to enrich himself; and on Tricolor's lenders, who provided over a billion dollars in funding based on Tricolor's fabricated data and false statements.

2.      In the summer of 2025, lenders confronted DANIEL CHU, the defendant, and others at Tricolor with concerns about Tricolor's collateral. CHU and his conspirators initially tried to conceal the fraud and to falsely claim that the collateral issues were due to an administrative error. Those efforts failed. CHU, recognizing that Tricolor was, in his words, "basically history," turned his attention to extracting millions of dollars from the company. At CHU's direction, Tricolor transferred over $6 million to CHU after lenders voiced concerns in or about late August 2025.

3.      After the fraudulent double-pledging and collateral manipulation schemes orchestrated by DANIEL CHU and DAVID GOODGAME, the defendants, unraveled, Tricolor was unable to maintain its access to loans and unable to sustain its business without substantial cash. On or about September 10, 2025, Tricolor filed for Chapter 7 bankruptcy. By that time, the company's largest lenders had advanced and were owed more than $900 million as a result of the defendants' schemes.

### Background: Tricolor and its Lending Facilities

4.      Founded in or about 2007, Tricolor sold and provided subprime financing for used cars, focusing specifically on Hispanic customers with limited or no credit history. By in or about 2025, Tricolor had grown to become the third-largest used auto retailer in Texas and California, operating approximately 65 retail centers in Texas, California, Nevada, Arizona, New Mexico, and Illinois, as well as a shared services center in Guadalajara, Mexico. At its peak, Tricolor employed over 1,500 people and generated approximately $1 billion in annual revenue in both 2023 and 2024. When the company filed for Chapter 7 bankruptcy on or about September 10, 2025, it had over 60,000 outstanding car loans.

5.      Tricolor funded its operations substantially through cash advances from several

lenders with which Tricolor had entered credit agreements. Under these agreements, Tricolor pledged certain assets to the lenders as collateral and received cash advances secured by that pledged collateral. Tricolor maintained inventory lines of credit collateralized by used cars in Tricolor's possession. The company also maintained multiple lines of credit collateralized by the car loans that Tricolor had issued to its customers—specifically, by the car loan receivables, meaning the forthcoming payments that would be received from borrowers until their loans were repaid. Each credit agreement specified eligibility requirements for collateral, and Tricolor generally did not receive a 100% advance rate on such eligible loans. Instead, Tricolor received advance rates at a lower amount, such as 60% to 80% of an eligible car loan's outstanding balance. In addition to these receivables-backed lines of credit, Tricolor also raised capital by securitizing car loan receivables—that is, organizing groups, or tranches, of the receivables into classes of bonds that were then sold to investors.

6. Tricolor maintained lines of credit with several financial institutions and investment management firms. In or about February 2018, Tricolor entered into a revolving line of credit agreement with a U.S. bank ("Lender-1") that reached approximately $25 million in commitments, collateralized by car loan receivables (the "Lender-1 Credit Line"). In or about January 2020, Tricolor entered into credit agreement with another U.S. bank ("Lender-2") for an inventory line that reached $87 million in commitment, supposedly secured by Tricolor's used vehicle inventory (the "Lender-2 Inventory Credit Line"). Beginning in or about August 2020, Tricolor established a series of warehouse lending facilities—short-term revolving credit facilities extended to loan originators to temporarily fund loans before sale to permanent investors. These warehouse facilities, associated with special purpose vehicles and referred to as "SPV3," "SPV4," "SPV5," and "SPV6," were collateralized by car loan receivables and involved various lenders including a

California-based investment manager ("Lender-3") and U.S. banks. The SPV3 warehouse reached approximately $100 million in total commitment. The SPV4 warehouse ultimately reached approximately $770 million in total commitment, shared among multiple lenders including a U.S. bank ("Lender-4"), another bank ("Lender-5"), and junior mezzanine lenders based in New York, New York ("Lender-6" and "Lender-7"). In August 2022, Tricolor entered into the SPV6 warehouse with a U.S. bank ("Lender-8"), which reached $250 million in commitment. In March 2025, Tricolor entered into a mezzanine loan agreement with a New York, New York-based asset management firm ("Lender-9") for $35 million. By the time of bankruptcy, Tricolor owed approximately $923 million to lenders through these facilities.

7. Tricolor's lenders generally set eligibility criteria for the types of collateral that could be pledged in exchange for cash advances. These eligibility requirements for collateral were typically set out in credit agreements between the lender and Tricolor. For receivables-backed lines of credit, eligibility turned on, among other things, whether the car loan was current— meaning the customer was making timely payments—or past due, meaning the customer had missed a scheduled payment and the loan was delinquent. Loans that were more than 60 days past due were generally ineligible to serve as collateral under the terms of the credit agreements and could not be pledged in exchange for cash, and some lines of credit excluded loans more than 30 days past due.

8. As generally required under the loan agreements, Tricolor pledged cars and loans and requested advances by sending lenders borrowing base reports. These reports typically took the form of large Excel files with thousands of rows, one for each loan pledged to the facility. These borrowing base reports provided dozens of data points for each loan, including the outstanding principal balance, the vehicle identification number ("VIN") of the financed car, and

data related to whether the loan was current or past due. These reports generally identified loans as being current, 0-15 days past due, 15-30 days past due, 30-60 days past due, and 61+ days past due, and included a column for the last payment date. Tricolor typically sent borrowing base reports and funding requests to lenders multiple times a week. At the conclusion of each month, Tricolor would generally send each lender a monthly servicer report ("MSR") that summarized the pledged collateral for the past month.

### Tricolor's Fraud on its Lenders

9.  For years, DANIEL CHU and DAVID GOODGAME, the defendants, Jerome Kollar, Tricolor's chief financial officer, and Ameryn Seibold, Tricolor's senior director of finance, and others, engaged in a series of frauds directed at each of Tricolor's lenders. These schemes operated through two primary mechanisms: first, CHU, GOODGAME, and their conspirators double-pledged the same collateral to multiple lenders, allowing Tricolor to borrow against the same assets, at the same time, repeatedly; second, they manipulated loan data to make ineligible, delinquent loans appear current and compliant with lender requirements. Additionally, to conceal their deceptions from lenders, auditors, and collateral managers, the conspirators fabricated and disseminated fictious backup records, such as records of fake customer payments. Under CHU's leadership, this activity became Tricolor's routine manner of business and eventually Tricolor's means of financial survival.

10. In or about 2018, Tricolor faced liquidity pressure. To address that problem, DANIEL CHU, the defendant, instructed Kollar to pledge delinquent loans to the Lender-1 Credit Line. These delinquent loans were typically so past due that Tricolor itself had charged them off as losses. To make these charged-off loans falsely appear to be performing loans that could serve as collateral (which they were not), CHU directed Kollar to create a fictitious portfolio company in Tricolor's dealer management system (which was used to track Tricolor's loans and their

5

associated data), transfer the charged-off loans to that new portfolio company in the dealer management system, and arrange for other Tricolor employees to manually enter fake payments on those charged-off loans in the dealer management system.

11. Over time, DANIEL CHU, the defendant, addressed liquidity constraints by repeatedly falsifying information regarding ineligible collateral to make it appear eligible to use as collateral. In January 2021, for example, CHU asked Kollar whether Tricolor had "anything we can pledge from [Lender-1] to [Lender-4] or [Lender-3] to get some liquidity," and Kollar responded, "I will look. What is 'there' typically is [ineligible] for those"—referring to the charged-off loans manipulated to look like they were performing loans. CHU and his co-conspirators fraudulently pledged charged-off loans to Lender-1 for years until Tricolor's collapse. In addition to orchestrating this fraud within Tricolor, CHU simultaneously served on the board of directors of Lender-1, a financial institution he defrauded for nearly a decade.

12. By at least in or about 2021, Tricolor's collateral manipulation also expanded beyond the Lender-1 Credit Line. To increase the amount of cash received from Lender-2, DANIEL CHU, the defendant, directed Kollar to keep sold vehicles on the borrowing base for the Lender-2 Inventory Credit Line, even though they were supposed to be removed once sold, a practice that continued through Tricolor's bankruptcy. For instance, on or about April 20, 2021, CHU texted Kollar and others that, "[i]n an ideal scenario, we buy and increase inventory by $10mm and then we can move the sold units off the borrowing base"—meaning Tricolor would increase its inventory by $10 million to give it enough cushion to remove the sold units that were fraudulently included on the Lender-2 Inventory Credit Line borrowing base. To further increase the amount of cash received from lenders, Tricolor also pledged to other lenders the loan receivables for cars that had been sold and financed, but that were still nonetheless pledged to the

Lender-2 Inventory Credit Line.

13. As Tricolor's financing arrangements with lenders expanded, so did its use of fraud. From at least in or about 2022, DANIEL CHU and DAVID GOODGAME, the defendants, Kollar, Seibold, and others repeatedly manipulated borrowing base data (including loan performance data) for, and double-pledged collateral across, the SPV3, SPV4, SPV5 and SPV6 warehouses and the Lender-9 Credit Line. At CHU's direction and with GOODGAME's knowledge and approval, Kollar and Seibold, sometimes with the assistance of others, executed the schemes to defraud Tricolor's lenders by submitting fraudulent borrowing base reports. CHU directed Kollar to fraudulently obtain more liquidity, and Kollar, in turn, directed Seibold to submit fraudulent borrowing base reports. Kollar, Seibold, and others submitted borrowing base reports with false and manipulated data or already-pledged loans to the Lender-1 Credit Line, the Lender-2 Inventory Credit Line, the SPV3 warehouse, the SPV4 warehouse, the SPV5 warehouse, the SPV6 warehouse, and the Lender-9 Credit Line in order to fraudulently obtain cash advances.

14. As the risks and dollar size of the fraud dramatically increased, the conspirators' used the same fraudulent methods. Kollar, Seibold, and others manually edited collateral data in borrowing base reports provided to lenders so that ineligible loans would falsely appear to lenders to meet eligibility criteria when in fact the loans were significantly past due. They did this with the awareness and, at times, specific direction of DANIEL CHU, the defendant. For instance, on or about July 25, 2022, CHU texted Kollar, "Can we work the > 60s"—asking whether Kollar could manipulate data for loans over 60 days past due to make them appear eligible. In response to these requests, and to achieve CHU's overarching directives, Kollar and Seibold would manually change the data fields in borrowing base reports related to whether a loan was performing or past due by, for example, editing loans more than 60 days past due to appear current or paid within the past 60

days. Kollar would also periodically update CHU on their progress. On November 16, 2022, for example, when CHU asked for an update on liquidity, Kollar responded: "We have $2.1m to [pledge] and with working DQ [delinquency] buckets we are getting $2.77M or ~$1.3m more. Will do a Bb [borrowing base] tomorrow and work to squeeze a little more out." In other words, by manipulating delinquency data in borrowing base reports, Kollar increased the volume of eligible loans, generating an additional $1.3 million in advanced funds from lenders. Similarly, on April 26, 2022, Kollar texted CHU: "We maxed the [Lender-4] one [*i.e.*, the SPV4 warehouse] for tomorrow by adding $1M when we should have only received $300k and working on the [Lender-3] [*i.e.*, the SPV 3 warehouse] today"—meaning that collateral manipulation had obtained $1 million more from the SPV4 warehouse than would have been possible without fraud.

15. At the defendants' direction and with their knowledge, Kollar and Seibold also double-pledged the same loans as collateral to multiple lenders and securitizations. For example, on March 1, 2023, Seibold described this double-pledging to DAVID GOODGAME, the defendant, writing that he was "taking accounts from SPV6 and pledging on SPV3 to get liquidity out of SPV3," to which GOODGAME jokingly responded with a crying emoji, followed by Seibold stating he was "then possibly taking SPV5 accounts and double pledging on SPV6." As another example, on September 8, 2023, when GOODGAME messaged Seibold about selling more inventory each week, Seibold explained that "We are bringing in between 6-8M a week on the main spvs right now" but that "[i]t's been tight just because of how close we are to maxing out the facilities" and that Tricolor was "[r]eally needing the securitization." Their conversation continued with Seibold explaining, "Spv6 is capped out. Spv4 is making it hard with this notional interest rate cap. Spv3 is capped out. We have some room on SPV5 but are trying to keep it relatively clean. Doing everything I can to make sure we still have as much as we can coming in.

8

The audits are going to be tough." GOODGAME responded "ugh." Seibold replied, "Hopefully after this securitization we can keep them a bit cleaner" before sending an "lol" emoji, to which GOODGAME responded "Lol," as they joked about how Tricolor could not keep its lines of credit "clean" of fraud.

16.     The growing risk and scale of the frauds eventually forced the conspirators to reckon with the possibility the frauds would be discovered. Seibold at various times raised concerns to DAVID GOODGAME, the defendant, among others, but GOODGAME always reassured Seibold and Seibold would continue. To minimize the risks of discovery, however, and with the knowledge of DANIEL CHU, the defendant, and GOODGAME, Kollar and Seibold fabricated and falsified backup records when audits of the borrowing bases were conducted, including loan payment ledgers and system records indicating to which lender a loan had been pledged. On July 22, 2021, for example, while an audit firm was conducting an audit of Tricolor's prior year financial statements, Kollar texted CHU, "We will need to make sure [the auditor] does not try to[ t]ie out [Lender-1]," because a comparison of the manipulated data that was provided to Lender-1 to the real data in Tricolor's internal dealer management system would have revealed the fraud. CHU responded: "I know." Later, on July 28, 2023, in connection with another audit, CHU texted Kollar: "Can you reconstruct [Lender-1] BB," referring to the borrowing base of purported collateral pledged to Lender-1. Kollar responded, in part, "It includes loans that are not active."

17.     By on or about August 21, 2025, Kollar had conducted an analysis comparing the collateral data in Tricolor's dealer management system to the fraudulent collateral data that Tricolor had provided to lenders to obtain capital. Using the fraudulent borrowing bases that Tricolor had sent to lenders, Kollar added up the total amount of purported collateral that Tricolor

9

had pledged to lines of credit, securitizations, and other facilities, which totaled approximately $2.2 billion. When Kollar performed the same calculation using Tricolor's internal dealer management system, however, the real amount of Tricolor's available collateral was approximately $1.4 billion. In other words, Tricolor had pledged approximately $2.2 billion of collateral to lenders and investors, but Tricolor had only approximately $1.4 billion of real collateral. The difference—consisting of approximately $800 million in bogus collateral—resulted from the series of schemes and the conspiracy in which DANIEL CHU and DAVID GOODGAME, the defendants, Kollar, Seibold, and others participated.

### The Frauds Unravel

18. As of in or about August 2025, Tricolor had still not completed an audit of its borrowing bases that had begun in or about February 2025. Lender-6 expressed concerns to Lender-4 about the unfinished audit. In reviewing Tricolor's borrowing base reports in or about August 2025, Lender-6 noticed discrepancies in Tricolor's data: loans that Tricolor reported as current—that is, as receiving timely payments from customers—did not show a corresponding reduction in the outstanding principal balance. This data made no sense as customers' payments would pay down a loan over time.

19. In or about August 2025, DANIEL CHU, the defendant, was alerted to the audit issue and then to the data discrepancies identified by Tricolor's lenders. The developing crisis prompted a series of calls among Tricolor executives, including, at times, CHU, DAVID GOODGAME, the defendant, Kollar, and another Tricolor executive ("Executive-1"). Some of these calls were secretly recorded by at least one participant, and sometimes calls were secretly recorded by multiple participants.

20. On or about August 17, 2025, for example, DANIEL CHU, the defendant, spoke with Kollar and Executive-1 about Lender-6's concerns regarding Tricolor's delay in completing

the audit. CHU urged the team to find a solution, observing that "rather than conform all of our records to meet the audit, I think we need to, we need to rethink, kind of holistically, all of the processes that are resulting in this" delay. CHU then drew an "analogy" to when the team managed to obscure Tricolor's fraudulent use of "dead loans on the balance sheet" to borrow capital during the 2022 financial statement audit. CHU emphasized that his "point in that analogy" was that "rather than scrambling" to figure out, "okay, how are we gonna fabricate these loans? How are we gonna make up these loans? We just basically created around the problem with a structure, or I would say in this case, a policy, which, which made it, made all the math work." CHU then said, "we have a similar math problem today" and discussed with Kollar the buckets of manipulated loans and confirming exactly what fake data had been sent to the lenders on the SPV4 Warehouse.

21.     During the August 17, 2025 call, DANIEL CHU, the defendant, proposed various lies the conspirators could tell to resolve the audit and explain the manipulated data. For example, CHU proposed that some of the manipulated, non-paying loans could be explained away by a purported "Trump administration deferment" policy. In fact, such a deferment policy did not actually exist at Tricolor. Nevertheless, CHU explained that, with this fictitious policy, "all I'm trying to do is, is alleviate the need to mess with any of these things and create a policy." CHU acknowledged, however, that "where we would have an issue is if, if they sent an auditor and they said, pull this up on your screen, right, that would be a problem." Kollar agreed, stating, "Yes. That would be bad,"—as Tricolor's internal records would not match the manipulated records and false excuses Tricolor provided to lenders and auditors.

22.     The following day, on or about August 18, 2025, the Tricolor executives, including DANIEL CHU and DAVID GOODGAME, the defendants, Kollar, and Executive-1, continued to discuss how to conceal the fraud. During the call, CHU described how Lender-6 had identified,

11

among other things, "$63 million of loans that have not had a payment in 180 days that are marked as current in the borrowing base." CHU complained that he did not understand how Seibold could "be doing this and not thinking that the balance has to reduce," saying it was "the stupidest fucking thing [he had] ever heard." Once Seibold was added to the call, CHU, in effect, demanded to know why Seibold had not thought to falsely reduce the balances in the borrowing base provided to lenders when Seibold fraudulently marked the loans as current. Seibold responded: "I've been holding 8,000 outstanding charge offs on every report for about … a long time." When CHU asked whether Seibold ever reduced the balance, Seibold explained: "We do, but some we don't. … I can't reduce by a full 8,000 without having us have millions of dollars in debts that we need to pay down…. I'm doing what I thought was what we needed."

23.  The next day, on or about August 19, 2025, the Tricolor executives, including DANIEL CHU and DAVID GOODGAME, the defendants, Kollar, and Executive-1, spoke again by telephone. During the call, CHU described how he had spoken to a Lender-6 representative the prior evening. CHU recounted how he had told Lender-6, "look, if we were trying to commit fraud, we wouldn't be so stupid as to keep the same balances on there… Nobody would be that stupid. And he [the Lender-6 representative] goes, 'you're right.'" The participants on the August 19 call laughed in response. CHU also recounted how he told the representative of Lender-6 that it must be a "system issue." These were lies. As CHU well knew, the inconsistencies in the borrowing bases resulted from the frauds and the conspiracy among CHU, GOODGAME, and their co-conspirators, and not some supposed system issue.

24.  On or about August 30, 2025, the Tricolor executives, including DANIEL CHU and DAVID GOODGAME, the defendants, Kollar, and Executive-1, discussed how they might reach a settlement with Lender-4, which, by that point, had identified double-pledged and manipulated

12

collateral and terminated its lending facility. During this call, CHU compared Tricolor's circumstances to the circumstances of Enron, the energy trading firm that collapsed into bankruptcy following the discovery of accounting fraud and other misconduct. Specifically, CHU and the others discussed the possibility that they could blame the banks for purportedly ignoring red flags of their frauds and use that threat as leverage to extract a favorable settlement. CHU proposed using artificial intelligence tools to search for key words that GOODGAME could use in a discussion with Lender-4. After Executive-1 described an Enron-related litigation, CHU stated: "Enron obviously has a nice ring to it, right? <laugh>, I mean, Enron, Enron raises the blood pressure of the lender when they see that <laugh>. It, it has to, right? I'm not— […] Cause who wants to be thrown in the category?" CHU later said, "That Enron case is fucking perfect, I think."

25.    Even as the frauds unraveled and Tricolor's insolvency became clear, DANIEL CHU, the defendant, continued to enrich himself. Throughout the fraud scheme, CHU had received tens of millions of dollars in compensation from Tricolor, including an annual salary, bonuses, management incentive units, and company-provided cars. CHU's annual salary was $1 million in 2023, which was raised to $2 million in 2025. He also received a $2 million bonus for 2024, two $125,000 securitization bonuses in 2025, and a $15 million bonus in 2025. During the 24-month period from August 2023 through August 2025, Tricolor made more than $19.3 million in salary and bonus net cash payments to CHU's bank accounts. As Tricolor approached collapse, and after CHU observed that the company was "definitely insolvent," he directed Kollar to pay him the final installments of his $15 million bonus. On or about August 19 and 20, 2025—roughly three weeks before Tricolor placed more than 1,000 employees on unpaid leaves of absence and before the company filed for bankruptcy—CHU received two payments from Tricolor totaling $6.25 million.

CHU used some of this money to purchase a multi-million-dollar property in Beverly Hills, California on or about August 27, 2025. Days later, on September 6, 2025, Tricolor placed more than 1,000 of its employees on unpaid leaves of absence. On September 10, 2025, Tricolor filed for Chapter 7 bankruptcy.

## Statutory Allegations

26. From at least in or about 2018 up to and including in or about September 2025, in the Southern District of New York and elsewhere, DANIEL CHU, the defendant, knowingly organized, managed, and supervised a continuing financial crimes enterprise, in that the defendant committed violations of Title 18, United States Code, Sections 1343 and 1344, including violations one through ten set forth below, which violations were part of a series of violations of those statutes committed by at least four persons acting in concert, and from which the defendant received $5,000,000 and more in gross receipts from such enterprise during a 24-month period. The series of violations, as defined by Title 18, United States Code, Section 225, includes the following violations set forth below:

27. In or about the years listed in the table below, in the Southern District of New York and elsewhere, DANIEL CHU, the defendant, knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, CHU, while the CEO of Tricolor, engaged in schemes to make a series of false statements to the financial institutions listed below regarding Tricolor's financial condition and the existence, nature, and value of its pledged loan collateral in order to fraudulently obtain money for Tricolor from those financial institutions.

| Violation Number | Financial Institution and Credit Agreement | Approximate Time Period |
|---|---|---|
| 1 | Lender-1<br>Lender-1 Credit Line | 2018 to September 2025 |
| 2 | Lender-2<br>Lender-2 Inventory Credit Line | 2020 to September 2025 |
| 3 | Lender-4 and Lender-5<br>SPV4 Warehouse | 2020 to September 2025 |
| 4 | Lender-5<br>SPV5 Warehouse | 2021 to 2023 |
| 5 | Lender-8<br>SPV6 Warehouse | 2022 to September 2025 |

28. In or about the years listed in the table below, in the Southern District of New York and elsewhere, DANIEL CHU, the defendant, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, CHU, while the CEO of Tricolor, engaged in schemes to make a series of false statements to lenders listed below, including multiple financial institutions, regarding Tricolor's financial condition and the existence, nature, and value of its pledged loan collateral in order to fraudulently obtain money for Tricolor from those lenders, and caused others to send and receive, emails, telephone calls, videoconferences, and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

| Violation Number | Financial Institution and Credit Agreement | Approximate Time Period |
|---|---|---|
| 6 | Lender-1<br>Lender-1 Credit Line | 2018 to September 2025 |
| 7 | Lender-2<br>Lender-2 Inventory Credit Line | 2020 to September 2025 |

| 8 | Lender-4, Lender-5, Lender-6, Lender-7<br>SPV4 Warehouse | 2020 to September 2025 |
|---|---|---|
| 9 | Lender-5<br>SPV5 Warehouse | 2021 to 2023 |
| 10 | Lender-8<br>SPV6 Warehouse | 2022 to September 2025 |

(Title 18, United States Code, Sections 225 and 2.)

## COUNT TWO
**(Conspiracy to Commit Bank Fraud and Wire Fraud Affecting a Financial Institution)**

The Grand Jury further charges:

29. The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as it fully set forth herein.

30. From at least in or about 2018 through in or about September 2025, in the Southern District of New York and elsewhere, DANIEL CHU and DAVID GOODGAME, the defendants, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit bank fraud, in violation of Title 18, United States Code, Section 1344, and to commit wire fraud, which affected a financial institution, in violation of Title 18, United States Code, Section 1343.

31. It was a part and an object of the conspiracy that DANIEL CHU and DAVID GOODGAME, the defendants, and others known and unknown, knowingly would and did execute, and attempt to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, in violation of Title 18, United States Code, Section 1344, to wit, CHU, GOODGAME, and others agreed to make and cause to be made a series of false statements to multiple financial institutions regarding

16

Tricolor's financial condition and the existence, nature, and value of its pledged loan collateral in order to fraudulently obtain money for Tricolor from those financial institutions.

32. It was further a part and an object of the conspiracy that DANIEL CHU and DAVID GOODGAME, the defendants, and others known and unknown, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, which affected a financial institution, in violation of Title 18, United States Code, Section 1343, to wit, CHU, GOODGAME, and others agreed to make and cause to be made a series of false statements to lenders, including multiple financial institutions, regarding Tricolor's financial condition and the existence, nature, and value of its pledged loan collateral in order to fraudulently obtain money for Tricolor from those lenders, and sent and received, and caused others to send and receive, emails, telephone calls, videoconferences, and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Section 1349.)

## COUNT THREE
### (Bank Fraud)

The Grand Jury further charges:

33. The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as it fully set forth herein.

34. From at least in or about 2020 through in or about September 2025, in the Southern District of New York and elsewhere, DANIEL CHU and DAVID GOODGAME, the defendants,

knowingly executed, and attempted to execute, a scheme and artifice to defraud a financial institution, as that term is defined in Title 18, United States Code, Section 20, and to obtain moneys, funds, credits, assets, securities, and other property owned by, and under the custody and control of, such a financial institution, by means of false and fraudulent pretenses, representations, and promises, to wit, CHU, GOODGAME, and others engaged in scheme to make a series of false statements to Lender-4 and Lender-5 in connection with the SPV4 Warehouse regarding Tricolor's financial condition and the existence, nature, and value of its pledged loan collateral in order to fraudulently obtain money for Tricolor from Lender-4 and Lender-5.

(Title 18, United States Code, Sections 1344 and 2.)

## COUNT FOUR
### (Wire Fraud Affecting a Financial Institution)

The Grand Jury further charges:

35. The allegations contained in paragraphs 1 through 24 of this Indictment are repeated and realleged as it fully set forth herein.

36. From at least in or about 2020 through in or about September 2025, in the Southern District of New York and elsewhere, DANIEL CHU and DAVID GOODGAME, the defendants, knowingly having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds, for the purpose of executing such scheme and artifice, which affected a financial institution, to wit, CHU, GOODGAME, and others engaged in a scheme to make a series of false statements to Lender-4, Lender-5, Lender-6, and Lender-7 in connection with the SPV4 Warehouse regarding Tricolor's financial condition and the existence, nature, and value of its pledged loan collateral in

order to fraudulently obtain money for Tricolor from those lenders, and caused others to send and receive, emails, telephone calls, videoconferences, and other electronic communications, to and from the Southern District of New York and elsewhere, in furtherance of that scheme.

(Title 18, United States Code, Sections 1343 and 2.)

## FORFEITURE ALLEGATIONS

37. As a result of committing the offenses alleged in Counts One, Two, Three, and Four of this Indictment, DANIEL CHU and DAVID GOODGAME, the defendants, shall forfeit to the United States, pursuant to Title 18, United States Code, Section 982(a)(2)(A), and Title 28, United States Code, Section 2461(c), any and all property constituting, or derived from, proceeds the defendant obtained directly or indirectly, as a result of the commission of said offenses, including but not limited to a sum of money in United States currency representing the amount of proceeds traceable to the commission of said offenses.

### Substitute Assets Provision

38. If any of the above-described forfeitable property, as a result of any act or omission of the defendants:

    a. cannot be located upon the exercise of due diligence;

    b. has been transferred or sold to, or deposited with, a third person;

    c. has been placed beyond the jurisdiction of the Court;

    d. has been substantially diminished in value; or

    e. has been commingled with other property which cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 21, United States Code, Section 853(p) and Title 28, United States Code, Section 2461(c), to seek forfeiture of any other property of the defendants up to the value of the above forfeitable property.

(Title 18, United States Code, Section 981
Title 18, United States Code, Section 982;
Title 21, United States Code, Section 853; and
Title 28, United States Code, Section 2461.)

JAY CLAYTON
United States Attorney